IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 13 |
| JAMES ROBERT WENNING and | * | |
| DAWN TAMARA WENNING, | * | |
| Debtors | * | |
| | * | |
| FIA CARD SERVICES a/k/a BANK OF | * | CASE NO. 1:08-bk-00111MDF |
| AMERICA by eCAST SETTLEMENT | * | |
| CORPORATION as Agent, | * | |
| Objectant | * | |
| | * | |
| vs. | * | |
| | * | |
| JAMES ROBERT WENNING and | * | |
| DAWN TAMARA WENNING, | * | |
| Respondents | * | |

**OPINION**

This matter is before the Court on the Objection of FIA Card Services ("FIA") to the chapter 13 (the "Plan") filed by James and Dawn Wenning ("Debtors") in the above-captioned case. The basis for the objection is that Debtors are not dedicating a sufficient amount of their future income to the Plan. For the reasons that follow, I will deny FIA's objection.

**Procedural and Factual History**

On January 11, 2008, Debtors filed the instant chapter 13 case. Debtors stated on the schedule of income (Schedule I) that their gross monthly household income was $6,841.38[1] and their net monthly income was $4,556.24. On their schedule of expenses (Schedule J), Debtors stated that they incurred monthly household expenses of $4,421.25. Thus, when expenses listed

---

[1]The gross income amount of $6,841 38 on Schedule I is calculated by adding together the gross earned income of each debtor ($2,879.80 + $3,750.00) plus 1/12 of the income tax refund ($211.58).

1

on Schedule J are deducted from net income on Schedule I, Debtors have excess income of $134.99 ($4,556.24 - $4,421.25).

Debtors reported current monthly income of $6,320.91 on line 53 of Form 22C and monthly adjustments to income on line 58 of $6,150.06. Thus, Form 22C indicated that Debtors have disposable income of $170.85 per month. Consistent with the calculations of disposable income on Form 22C, Debtors' chapter 13 Plan (the "Plan") proposes to make payments of $175.00 per month for 60 months to the Trustee.

FIA holds an unsecured claim against Debtors in the amount of $30,609.75, which represents approximately 47% of Debtors' total unsecured, nonpriority debt. On April 9, 2008, FIA filed an objection to confirmation arguing that Debtors should be required to devote more than $175.00 per month to the Plan. FIA argues that Debtors' Schedule I reveals that Debtors income is now $520.47 a month higher than the income level they reported on Form 22C. Therefore, when this additional amount is added to the disposable income of $170.85 as reported on Form 22C, Debtors should be required to commit $691.32 a month to their plan.[2]

A hearing was held in this case on May 28, 2008, briefs have been filed, and the matter is ready for decision.

---

[2]In its brief, FIA suggests an alternative method of calculating projected disposable income that produces a slightly different amount than simply comparing the income stated on Form 22C with that reported on Schedule I. In the conclusion of its brief, FIA states that disposable income should be calculated by subtracting the expenses listed on Form 22C ($6,150.66) from Debtors' gross income on Schedule I ($6,841.38). However, contrary to the statement in FIA's brief, the difference between these two figures is $690.72, not $691.32.

2

## Discussion

The within matter requires me to interpret section 1325(b) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 ("BAPCPA"). 11 U.S.C. § 1325(b). Section 1325(b) provides that if the trustee or an unsecured creditor objects to the confirmation of a plan, the plan cannot be confirmed unless the claim is paid in full or:

> (B) the plan provides that all of the debtor's *projected disposable income* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.
>
> > (2) For purposes of this subsection, the term "*disposable income*" means current monthly income received by the debtor . . . less amounts reasonably necessary to be expended –
> >
> > > (A)(i) for the maintenance or support of the debtor or a dependent of the debtor. . . .

11 U.S.C. § 1325(b)(1)(B) (italics added). In short, § 1325(b)(1)(B) provides that if the trustee or an unsecured creditor objects, the court may not approve a chapter 13 plan that fails to commit all of a debtor's "projected disposable income" for the applicable commitment period[3] unless the plan will pay all unsecured claims in full. In *In re Vaughn*, 2007 Bankr. LEXIS 4227 (Bankr. M.D. Pa. June 8, 2007), I held that the starting point for calculating "projected disposable income" is to multiply the number of months in the applicable commitment period by "current monthly income" ("CMI") as defined in 11 U.S.C. § 101(10A).[4] However, I also noted that

---

[3]The applicable commitment period is either three or five years depending on whether the debtor's gross income is above or below the median for the debtor's state of residence. 11 U.S.C. § 1325(b)(4). In the within case, Debtors' income is above the median income and the applicable commitment period is therefore five years.

[4]Section 101(10A) defines CMI as:

3

there will be rare instances in which other factors should be considered, for example, when a debtor experiences significant, lasting changes to income or expenses after filing that would not have been considered in the standard calculation of projected disposable income.

In the instant case, FIA asserts that Debtors' situation is that rare case in which projected disposable income should not be calculated by multiplying the CMI by the number of months in the applicable commitment period. In essence, FIA argues that it would be absurd to permit Debtors to pay $175.00 per month into their Plan while permitting them to retain an additional $520.47 in "disposable income" that Schedule I suggests that they have available to them.

As I posited in *Vaughn*, rigid application of the formulaic determination of disposable income required by Form 22C may produce an absurd result in rare circumstances. For example, if a debtor lost "lucrative employment immediately prior to the filing of the petition with little prospect of obtaining comparable income within a reasonable period," it would be absurd to deny a debtor relief because of a drastic reduction income. *Vaughn*, at *2. The instant situation is the reverse of the example I described in *Vaughn*. Debtors' monthly income at the time they filed for

---

> the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on--
>
>> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
>>
>> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii) . . . .

11 U.S.C.A. § 101(10A).

4

Case 1:08-bk-00111-MDF    Doc 33    Filed 10/08/08    Entered 10/10/08 15:37:51    Desc
Main Document      Page 4 of 8

bankruptcy was higher than their average monthly income during the six-month period before they filed.

If Debtors were required to make additional payments of $520.47 a month, the Plan would be funded with an additional $31,228.20, in addition to the $10,500.00 already committed to the Plan. Thus, the precise question to be determined in this case is whether a plain meaning application of § 1325(b) is absurd when unsecured creditors would receive a significantly higher return if current income, rather than average income over the six-month period prior to filing, is used to calculate projected disposable income?

An interpretation of a Federal statute is "absurd" if it is "so gross as to shock the general moral or common sense." *Maryland State Dep't of Educ. v. United States Dep't of Veterans Affairs*, 98 F.3d 165, 169 (4th Cir.1996)(quoting *Crooks v. Harrelson*, 282 U.S. 55, 59-60, 51 S.Ct. 49, 75 L.Ed. 156 (1930)) *cited in In re Taylor*, 388 B.R. 115, 121 (Bankr. M.D. Pa. 2008). "A result will only be deemed absurd if it is unthinkable, bizarre or demonstrably at odds with the intentions of its drafters." *In re Morgan,* 374 B.R. 353, 356 (Bankr. S.D. Fla. 2007) (citing *In re Spradlin*, 231 B.R. 254, 260 (Bankr. E.D. Mich. 1999)). *See also Public Citizen v. Dept. of Justice*, 491 U.S. 440 (1989). "Absurdity cannot mean that BAPCPA was awkwardly written, does not reach some of the understood goals of BAPCPA, and/or creates unintended consequences." *In re Purdy*, 373 B.R. 142, 150 - 51 (Bankr. N.D. Fla. 2007) (quoting *In re Kolb*, 366 B.R. 802, 806-08 (Bankr. S.D. Ohio 2007)). In the within case, I do not find that adherence to the plain meaning of § 1325(b) will produce an absurd result.

The Ninth Circuit Court of Appeals recently addressed a situation similar to the case at bar in *In re Kagenveama*, ___ F.3d ___, 2008 WL 2485570 (9th Cir. June 23, 2008). The Court

5

of Appeals affirmed the decision of the bankruptcy court, which confirmed the debtor's chapter 13 plan over the trustee's objection that the debtor was not committing to the plan all of her disposable income. On Schedules I and J the debtor reported that her income exceeded her expenses by $1,523.89. On Form 22C she reported no monthly disposable income. In reliance on her current income, the debtor proposed to pay $1,000.00 per month into the plan. In affirming the order confirming the plan, the Ninth Circuit made the following observations:

> the disposition required by the plain text of § 1325(b) is not absurd. Section 1325(b)'s new approach to calculating "disposable income" for above-median debtors produces a less favorable result for unsecured creditors when "disposable income" is plugged into the "projected disposable income" calculation. We will not override the definition and process for calculating disposable income under § 1325(b)(2) - (3) as being absurd simply because it leads to results that are not aligned with the old law. Furthermore, we will not de-couple "disposable income" from the "projected disposable income" calculation simply to arrive at a more favorable result for unsecured creditors, especially when the plain text and precedent dictate the linkage of the two terms. If the changes imposed by BAPCPA arose from poor policy choices that produced undesirable results, it is up to Congress, not the courts, to amend the statute.

*In re Kagenveama,* 2008 WL 2485570, at *4 (citing *In re Alexander,* 344 B.R. 742, 747 (Bankr. E.D. N.C. 2006) (other citations omitted)).

By creating the means test, Congress determined that a formula based upon historical income data and standard deductions provided a more reliable method of calculating projected disposable income than the pre-BAPCPA approach, which used Schedules I and J as a base with adjustments for changes in circumstances up to the confirmation date. When BAPCPA was enacted lawmakers must have been aware that in some situations a debtor would be earning more after filing for bankruptcy than he would before filing. Nevertheless, Congress opted for a

6

predictable, if flawed, formula through the adoption of the means test.[5] If it had intended to provide for an adjustment to projected disposable income when earnings increased after filing, they easily could have included such a provision. Or, as FIA has argued, the statute could have been drafted to include the ability to "mix and match" income and expenses from Form 22C and Schedules I and J to achieve the greatest amount of projected disposable income to be committed to plan payments. However, the dangers of calculating projected disposable income by subtracting expense numbers from income numbers that were never intended to be related are obvious.[6] I can perceive no logical reason why projected disposable income should be computed by subtracting the standard expenses allowed under the means test from income reported on a different form – Schedule I. FIA suggests that a bankruptcy court has the ability to ignore the means test form specified by Congress and to replace it with a test that varies from case to case, its only polestar being to obtain the maximum return for creditors. I find no justification for such an approach in the statute.

In the instant case, the difference between the amount to be paid into the Plan ($175.00) and the amount urged by the creditor ($691.32) is $516.32. In *Kagenveama*, the difference between the proposed plan payment and monthly net income from Schedules I and J was

---

[5] As I observed in *Vaughn,* the reasons Congress decided to use income for the six-month period prior to filing to determine CMI is not apparent in the statute. The purpose may have been to provide for fluctuations in income that occur with many debtors because of layoffs, overtime work and other factors. One court has speculated that perhaps Congress did not trust debtors to provide current information or simply wanted "formulaic certainty over judicial discretion." *In re Kolb*, 366 B.R. at 813.

[6] The income and expense figures in Form 22C are monthly averages over a six-month period. Schedules I and J are a snapshot of figures at a particular point in time. Using FIA's calculation method, an average monthly amount would be subtracted from an amount at a particular point in time. Comparing apples to oranges comes to mind.

Case 1:08-bk-00111-MDF    Doc 33    Filed 10/08/08    Entered 10/10/08 15:37:51    Desc
Main Document      Page 7 of 8

$523.89. If a $523.89 difference does not create an absurd result, then a difference of $516.32 should not as well.

Congress clearly had a specific formula in mind when it used the phrase "Current Monthly Income" in § 1325(b) and defined that phrase in § 101(10A) in terms of historical income figures. As I indicated in *Vaughn*, I have little doubt that in the universe of potential chapter 13 debtors there exists a case wherein a potentially absurd result will require a bankruptcy court to consider something other than Form 22C. I am sure that there exists a case and an amount in which it would be unthinkable, bizarre or demonstrably at odds with Congressional intent to hold that projected disposable income must be determined solely by the means test. The case *sub judice* is not that case. Accordingly, an order will be entered overruling the objection to the Plan.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: October 8, 2008

*This document is electronically signed and filed on the same date.*